# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | |
|---|---|
| ANDREW ROMINE, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., RASIER, LLC, and JOHN DOES 1-10,<br><br>     Defendants. | Civil Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff ANDREW ROMINE ("Plaintiff"), on behalf of himself and all others similarly situated, by counsel, alleges as follows:

## INTRODUCTION

1.    Plaintiff brings this action on behalf of all current and former Tennessee Uber Drivers ("Uber Drivers") against Uber Technologies, Inc., a Delaware Corporation, and Rasier, LLC, a Delaware Limited Liability Company (collectively, "Defendants" or "Uber"), for damages and equitable relief arising from Uber's misclassification of Uber Drivers as independent contractors rather than employees.

2.    Uber Drivers lack discretion in the performance of their employment relationship with Uber, and have no independence apart from Uber in performing their employment with Uber.

3.    Uber Drivers are able to secure fares only through Uber's mobile application, which governs every aspect of Uber Drivers' transportation services for Uber. When Uber restricts a Drivers' access to Uber's mobile application, Uber effectively terminates the Driver, as the Driver is unable to work for Uber or Uber's users. Uber's misclassification of its Drivers as non-employees of the company has resulted in Uber Drivers' inability to earn minimum wage.

1

4.    Plaintiff alleges that he and other Uber Drivers are employees, and as employees, are entitled to basic wage protections such as expense reimbursement, overtime pay, rest- and meal-breaks, and other benefits that attach to employees that do not likewise attach to independent contractors. Uber misclassifies its drivers as independent contractors in order to evade these and other protections of state and federal law. Because they are classified as independent contractors, Plaintiff and members of the putative class finance all expenses related to their employment with Uber (*e.g.,* gas, cost of insurance, deductibles, and vehicle maintenance, among others).

5.    Uber has and continues to misrepresent to the public and to the Drivers the manner by which it compensates its Drivers regarding customary gratuities. Uber markets its rides as gratuity-included, but does not remit the gratuity to Uber Drivers. As a result, Uber has been able to retain a percentage of the fare generated by the Drivers that is grossly disproportionate to the Drivers' monetary retention from the fare. At no time during the Class Period did Uber remit the gratuity (or an in-kind amount) to Uber Drivers. Uber effectively takes the tips.

6.    Most Uber Drivers have and continue to earn less than Tennessee's minimum wage, which was $7.25 in 2015-2016, as a direct and proximate result of Uber's misclassification of its Drivers.

7.    As Uber's employees, Plaintiff and the class he seeks to represent are owed fundamental wage protections that state and federal laws afford other Tennessee employees. Plaintiff seek damages and other appropriate relief on behalf of himself and other similarly situated aggrieved individuals who have worked for or who are currently working for Defendants.

2

## PARTIES

**Plaintiff**

8.     Plaintiff Andrew Romine is a citizen of the State of Tennessee and a resident of Knox County. Plaintiff currently works for Uber as an Uber driver.

**Defendants**

9.     Defendant Uber Technologies, Inc. is a Delaware corporation headquartered at 1455 Market Street, San Francisco, California 94103.  Defendant Uber Technologies, Inc. owns and operates the Uber transportation service and is authorized to conduct business and does conduct business throughout the State of Tennessee.

10.    Defendant Rasier, LLC, a subsidiary of Uber and the equivalent of Uber for the purposes of this action, is a Delaware limited liability company headquartered at 1455 Market Street, San Francisco, California, 94103.  Defendant Rasier, LLC is a wholly owned subsidiary of Uber, and is authorized to conduct business and does conduct business throughout the State of Tennessee.

11.    Each of the Defendant John Does 1 - 10 is the agent, servant, partner, joint-venturer, coventurer, principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its codefendant(s) in said co-defendant(s) performance of the acts and omissions described below. Plaintiff names each of these Doe Defendants by fictitious names because Plaintiff does not know these Defendants' actual identities and capacities. Despite reasonable efforts, Plaintiff has not been able to ascertain the identity of John Does 1-10.

3

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Fair Labor Standards Act (29 U.S.C. § 201 *et seq*.).

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and the parties are diverse, because Plaintiff is a citizen of the State of Tennessee and Defendants are citizens of the State of Delaware.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) the aggregate value of the amount in controversy exceeds the sum or value of $5,000,000.00, (ii) there is minimal diversity of citizenship between Plaintiff and Defendants, and (iii) the Class consists of more than 100 members.

15.     This Court has personal jurisdiction over Defendants because Defendants intentionally avail themselves of the rights and privileges of conducting business in the State of Tennessee, Defendants have continuous and systematic contacts with the State of Tennessee, and the injuries giving rise to the claims herein occurred in the State of Tennessee.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims over which the Court has original subject matter jurisdiction that the state law claims form part of the same case or controversy.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the events and conduct giving rise to the claims occurred in this District, and because Defendants: (i) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of

4

their service in this District, (ii) do considerable business in this District, and (iii) are subject to personal jurisdiction in this District.

18.     Plaintiff alleges on information and belief that each Defendant acted in all manner relevant to this action as the agent of the other Defendant, carried out joint business plans and operations, and the acts and omissions of each Defendant are legally attributable to the other Defendant.

## FACTUAL ALLEGATIONS

**Plaintiff Andrew Romine**

19.     In or around May of 2015, Mr. Romine began driving for Uber as an "UberX" driver. Mr. Romine continues to work for Uber as an Uber Driver.

20.     Uber compensates Mr. Romine on a weekly basis. Uber takes 20% of the total fares and the Driver receives the remaining 80%.  Because Mr. Romine was improperly classified as an independent contractor, he had to pay all employment related expenses, including gas, car repairs, lease payments, and insurance from his portion of the fare.

21.     Initially, Mr. Romine drove between thirty (30) and forty (40) hours per week, and Uber charged customers $1.25/mile driven and 15 cents per minute.

22.     In January of 2016, Uber unilaterally changed the cost of the fare in the State of Tennessee. Uber decreased the cost to customers, charging them only 70 cents per mile driven and 15 cents per minute. The unilateral change by Uber significantly and seriously undermined Mr. Romine's ability to earn minimum wage.

23.     From January of 2016, and continuing today, on average, Mr. Romine drives fifty (50) to sixty (60) hours per week to try to earn what he previously earned before Uber's drastic price cut.

5

24.     When driving 50-60 hours per week, Mr. Romine earns between $250 and $300 per week.  Mr. Romine incurs approximately $120 each week in expenses, including car wash and cleaning, phone and data usage, insurance as required by Uber, fuel, and car repairs, resulting in an effective hourly wage of $2.80, which reflects Mr. Romine's total compensation as an Uber Driver.

25.     For example, during the week of January 11, 2016 to January 18, 2015, Mr. Romine earned $408.30. After expenses of approximately $120, Mr. Romine earned just $288.30. If Mr. Romine drove 50 hours that week, as he typically did after Uber's significant price change, his effective hourly rate was $5.76, significantly below the required minimum wage.

26.     For example, during the week of January 25, 2016 to February 1, 2016, Mr. Romine earned $264.28. After expenses of approximately $120, Plaintiff earned just $144.28. If Mr. Romine drove 50 hours that week, as he typically did after Uber's significant price change, his effective hourly rate was $2.88, significantly below the required minimum wage.

27.     Currently, in Tennessee, minimum wage is $7.25 per hour.

28.     Mr. Romine's hourly wage was not at any time offset by expense reimbursement from Uber. Although it is currently unknown to Mr. Romine as it pertains to Arizona, Uber has saved as much as $730,000,000 since 2009 by not reimbursing the on-the-job expenses in California and Massachusetts.[1]

29.     Mr. Romine did not receive overtime compensation from Uber for weeks when he drove above forty (40) hours per week.

30.     On December 11, 2015, Defendants issued its most recent and operative contract with its Uber Drivers, self-servingly styled as a "Technology Services Agreement" (the

---

[1] http://qz.com/680503/uber-saved-730-million-by-hiring-drivers-in-two-states-as-contractors-instead-of-employees/ (last accessed on May 16, 2016)

"Agreement"). The Agreement contains a class action waiver arbitration provision. Among other things, the Agreement requires Drivers to opt out of the mandatory arbitration provision within 30 days. On December 23, 2015, Mr. Romine timely opted out of the arbitration provision by sending an e-mail to optout@uber.com and stating: "I, Andrew Romine, am writing this email to opt out of the Arbitration Agreement posted on December 10th 2015. I just accepted the agreement on my app today December 23 2015 read and elect to choose to opt out of provisions as outlined in the agreement as my right to do so. Thank you for time on this matter."

31.     The December 11, 2015 Technology Services Agreement supersedes prior contacts because Paragraph 14.5 sets forth:

> This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. (emphasis added).

32.     Because the December 11, 2015, Technology Services Agreement included a change from earlier agreements regarding California's Private Attorney General Act, Mr. Romine received a renewed opportunity to opt out of arbitration and pursue his claims in federal court.

33.     Defendants employ(ed) Plaintiff and members of the Class, exercised control over their wages, their hours, and their working conditions.

34.     Defendants regulate every aspect of Uber Drivers' job performance.

35.     As with other employers, Defendants required Plaintiff and Uber Drivers to submit to background checks, and to disclose banking information and residence, as well as social security numbers.

36.     Uber requires Plaintiff and Uber Drivers to register their cars with Uber and the vehicles cannot be more than ten years old.

7

37. Uber Drivers do not pay Defendants to use Defendants' intellectual property, the mobile application. Uber Drivers do not, in the strictest sense, pay Uber a fee as consideration for use of Uber's mobile application. Rather, Defendants compensate their Uber Drivers based upon the employment arrangement that Uber unilaterally imposes upon its Drivers, as with any employment-based business model.

38. Uber Drivers are not engaged in a business distinct from Uber's business. The Uber application ensures this. Through the application, Uber controls and directly manages Uber's entire transportation service, critically, inclusive of its Drivers.

39. Plaintiff's and Uber Drivers' ability to earn income depends solely on Uber and not in any way on an Uber Drivers' particular skill or acumen, or on any managerial or other discretionary job skill.

**Uber Profits by Deceiving Consumers and Drivers.**

40. Uber once deducted a $1 "safe ride" fee from each fare, which allegedly was to pay for background checks, driver safety education, and development of safety features in its mobile application – an expense that Uber, the employer, should pay. However, after a rider sued Uber for false representation upon discovering that her driver was a felon, Uber agreed to settle the litigation filed in California for approximately $28 million. Uber then changed the name of the fee to "booking fee," and increased it in the Knoxville area to $2.20, effectively passing on the settlement fee to the innocent drivers.

41. Uber misled Plaintiff as to the amount of income that he could earn driving for Uber. Uber told Plaintiff that drivers can earn $2,000 a week by driving for Uber. Plaintiff did not earn the guaranteed hourly pay that Uber promised, regardless of his having routinely worked in excess of a 40-hour week.

8



42.     Even if a Driver could earn $2,000 a week, the advertisement and offer is deceptive and misleading because in reality, as evident from Plaintiff's experience, after expenses and other costs improperly borne by Plaintiff, Ubers Drivers make less than minimum wage, which in Tennessee is $7.25 an hour.

43.     Moreover, Plaintiff and Uber Drivers do not receive (in-kind or otherwise) fare gratuity.

9

44.     Uber markets the rides in a manner that causes a reasonable belief that its Drivers are well compensated, and that as such, there's no need to tip.   Uber misleadingly confers that gratuity is included in the total cost of the fare and that there is no need to tip the Uber Driver:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file — there's no need to tip.

45.     In Tennessee, Uber specifically advertises: "no need to tip"[2] and "payment is completely cashless."

46.     Uber's website also advertises, "no cash, no tip, no hassle – just hop out, we'll automatically charge the credit card on file. And there's no need to tip."[3]

47.     Because the gratuity is reasonably expected to be in the total cost of the fare, Uber instructs its Drivers to decline acceptance of gratuity from Uber riders (as that would undermine Uber's entire "hassle free" campaign regarding tipping).

48.     Uber intentionally misrepresented that gratuity was included in the cost of fares and instructed passengers not to leave a tip in addition to the amount of the fare.

49.     Due to Uber's "there's no need to tip" mandate, Plaintiff and Uber Drivers have sustained damages in the amount of gratuity that he would have received (even if in-kind) but for Uber's misrepresentation.

**Uber's Profit Model is Based Upon Misclassifying Drivers as Independent Contractors.**

50.     In addition to its deceptive and unlawful practice regarding tipping, Uber uniformly misclassifies its drivers, including Plaintiff, as independent contractors when he should be classified as employees.

---

[2] https://www.uber.com/cities/knoxville/; https://www.uber.com/cities/nashville/ (last accessed on June 16, 2016).
[3] https://www.uber.com/ride/ (last accessed on June 16, 2016)

51. Uber is deeply involved in marketing its transportation services, qualifying and selecting Uber Drivers, regulating and monitoring their performance (including disciplining or terminating those who fail to meet its employment standards), and fare setting. The Drivers do none of these things, which one would expect if they were truly independent from Uber.

52. Uber exercises absolute control over the qualification and selection of its Drivers. Before driving for Uber, applicants must complete Uber's application process, including background checks.

53. Uber controls all work aspects of its Uber Drivers including Plaintiff, concerning the manner, methods, and means of their provision of transportation services for Uber. For example, upon signing an agreement to work for Uber, Uber required Plaintiff to watch a video demonstrating how Uber requires them to interact with passengers. Plaintiff was also instructed on the Uber requirements for picking up customers. Uber retains all necessary control over Plaintiff's and Uber Drivers' performance.

54. Uber monitors Plaintiff and Uber Drivers to ensure compliance with Uber's quality control standards. Uber requires all Drivers, including Plaintiff, to maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars. Requirements on how to improve a star rating are given to Uber Drivers that fall below this average in any given week. If an Uber Driver fails to maintain an average customer rating of 4.5, Uber gives the Driver 30 days to raise her rating within the required threshold. If the Uber Driver does not do so, Uber terminates that Drivers' employment with Uber by deactivating the Drivers' ability to use the application to pick up customers, and thus to continue to work. Uber Drivers are also effectively fired from Uber's employment if he does not log a certain number of hours driving, as required by Defendants.

11

55.     Moreover, Uber unilaterally sets the fares—with no negotiation or input from Plaintiffs—for all rides, and Drivers are required to charge the cost determined solely by Uber. Uber bills customers for the entire amount before remitting payment to Uber Drivers. Uber Drivers are paid by Uber.

56.     Uber claims a proprietary interest in its passengers, which further demonstrates that Uber acts as much more than an intermediary between passengers and Drivers. For instance, Uber prohibits its Drivers from answering rider queries about booking future rides outside the Uber application, or from otherwise soliciting Uber riders.

57.     As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments). Uber also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiff and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service. Uber also fails to pay into any insurance fund, including Social Security, disability, and unemployment insurance.

## CLASS ALLEGATIONS

58.     Plaintiff commences this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following "Class:"

> All natural persons who have driven for and/or who continue to
> work for Uber as an Uber Driver within the State of Tennessee
> from 2010 and continuing.

59.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or

amended complaint. Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

60. **Numerosity**: The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. The precise number of such persons is unknown as the data required to calculate that number is presently within the sole possession, custody, or control of Defendants. Upon information and belief, there are thousands of Uber Drivers in the State of Tennessee, and thus in the proposed Class.

61. **Commonality**: There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including but not limited to:

      a.    The policies, programs, practices, procedures, and protocols of Defendants concerning or relating to the Class members' actual and substantive work and job duties, their titles notwithstanding;

      b.    Whether Defendants are and were subject to federal overtime wage requirements;

      c.    Whether Defendants' policy and practice of classifying Class members as exempt from overtime wages under federal law and Defendants' policy and practice of failing to pay overtime wages violates applicable provisions of federal law;

      d.    Whether a gratuity is included in the total fare for Class members' services;

13

e. Whether Defendants were and are required to distribute the total proceeds of those gratuities to the Class members;

f. Whether Class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

g. Whether Defendants improperly classified Class members as independent contractors rather than employees;

h. Whether Class members have been required to pay the expenses of their employment with Uber and whether Uber is required to compensate members of the Class for those expenses;

i. The proper measure of damages and the proper measure of restitution recoverable by Class members; and

j. Additional common questions of law and fact as developed during the discovery phase of this litigation.

62. **Typicality**: Plaintiff's claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief Plaintiff seek is typical of the relief that Class members seek. All of the Class members were subject to the same pattern and practice of Defendants as alleged herein. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of the Defendants.

63. **Adequacy of Representation:** Plaintiff is able to fairly and adequately protect the interests of the Class and have no interests adverse to the Class. At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job

14

requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

64. **Predominance:** Questions of law and fact common to members of the Class predominate over any questions which may affect only individual members.

65. **Superiority**: Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. The losses, injuries, and damages are small as relevant to a class action analysis, such that without class treatment, individual action by each Class member would be cost-prohibitive.

66. The Class members are also readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are known to Defendants. The number and identity of the Class members are determinable from the records of Defendants.

67. The representatives and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

15

## CAUSES OF ACTION

## COUNT I
## VIOLATIONS OF FAIR LABOR STANDARDS ACT

68.     Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

69.     Uber's treatment of Plaintiff and control exercised by Uber indicate that Plaintiff is an employee and not an independent person contracting with Uber.

70.     Plaintiff realleges all that on an average workday, Uber Drivers receive approximately twenty ride requests through the Uber mobile application.  Once the request is received, the Plaintiff has an option to either "accept" or "reject" the request.  Uber requires as a condition of employment with Uber that the Drivers accept approximately ninety percent of the requests.  Accepting less than this threshold results in Uber deactivating the Drivers' account, and therefore, preventing the driver from receiving any rider requests.



ERROR

You rejected too many riders. Please wait up to 60 minutes to go back online.

OK

## HOW ARE ACCEPTANCE RATES CALCULATED?

Acceptance rates are calculated as a percentage of the total number of requests you accept out of those sent to you while online.

Maintaining a high acceptance rate keeps the Uber system reliable for riders and drivers. You should accept at least 80% of trip requests to retain your account status.

Please note that a rider canceling a trip will never count against your acceptance rate.

71.     Rejecting a certain number of requests will negatively impact Plaintiff's customer rating.  The employment agreement terms between Uber Drivers and Defendants, updated last on December 11, 2015, contains a provision that specifically states that the Uber Drivers' "failure to accept User requests for Transportation Services while [they] are logged in to the Driver App creates a negative experience for Users of Uber's mobile application."  If the customer rating falls

17

below a 4.5, the driver faces termination from employment with Defendants, or a temporary deactivation of access to the Uber mobile application, *i.e.*, probation.



72.     Plaintiff realleges that Defendants have required, or required Plaintiff and Uber Drivers who have driven for Uber, as part of their employment, to work without receiving the minimum wage for all hours worked, under 29 U.S.C. § 206(a), providing in pertinent part: "Every employer shall pay to each of his employees who in any work week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [minimum wage]."

73.     Plaintiff realleges all  that Defendants have required, or require Plaintiff and Uber Drivers, as part of their employment, to work without additional compensation, such as overtime

pay, in excess of the forty hours per week maximum under 29 U.S.C. § 207(a)(1), which provides: "Except as otherwise provided in this section, no employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate which is not less than one and one-half times the regular rate at which he is employed."

74.     Plaintiff further allege, in accordance with 29 U.S.C. § 216, that Defendants have required and/or require Plaintiff and Uber Drivers, as part of their employment, to work without compensation for *all* hours worked, to work beyond forty hours per week without the payment of overtime compensation for such hours, and/or cause them to work at a wage less than the minimum wage, pursuant to, *inter alia*, 29 U.S.C. §§ 206 and 207(a)(1).

75.     Defendants' violations of the FLSA were willful and are ongoing. As a result of the foregoing, Plaintiff seek judgment against Defendants for all unpaid wages, including overtime wages owed pursuant to 29 U.S.C. §§ 206 and 207, together with an award of an additional equal amount as liquidated damages, and costs, interests, and reasonable attorneys' fees, pursuant to, *inter alia*, 29 U.S.C. § 216(b).

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

76.     Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

77.     Uber interfered with the continuing business relationship between Drivers and riders—a separate relationship from that between either Uber and its Drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to Drivers, including Plaintiff, absent Uber's interference.

19

78. Uber intentionally and maliciously interfered with Plaintiff and Drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

79. Uber has stated to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the car service and that there is no need to tip the Driver.

80. For example, up until the end of 2012, Uber's website included such statements as "There's no need to hand your driver any payment and the tip is included" and "Please thank your driver, but tip is already included." Beginning in 2013, Uber's website has stated that "there is no need to tip."

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

81. Even after the statements were apparently removed from the Uber's website at the end of 2012 that tips are included in the fare, Uber has nevertheless continued to inform passengers through marketing materials that tips are included in the fare. For example, as recently as at least April of 2015, Uber has sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

82. In addition, at various times (and at least through the end of 2012), Uber's contracts with its customers have incorporated by reference the statements and representations made on its website regarding pricing, which includes such statements as the "tip is included" in the fare. For example, Uber's contracts with its customers (at least through the end of 2012) contained such statements as: "The Company may change the fees for our Service or Software as we deem necessary for our business. We encourage you to check back at our website periodically if you are interested about how we charge for the Service of [sic] Software."

20

83.     However, despite Uber's representations to customers that the fare includes a gratuity (and despite Uber's contracts with customers that incorporated its pricing information on its website, including the website statements that "tip is included"), Uber drivers have not received the total proceeds of this gratuity.

84.     In reality, Uber collected gratuities and then failed to remit them to drivers.

85.     Defendants' failure to remit gratuities to the Drivers, which riders believed would be remitted to the Drivers based on Uber's misrepresentations, constitutes unlawful tortious interference.

86.     Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its drivers.

87.     Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

88.     Uber knew that this would be a benefit accruing to the Drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

89.     Uber's conduct damaged Plaintiff and other drivers.

**COUNT III**
**BREACH OF CONTRACT**

90.     Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

91.     Uber has an implied in-fact contract with Plaintiff and other Drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

92.     Plaintiff and other Drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to Drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various webpages.  By entering into this agreement, customers intended to secure a financial benefit for Drivers, including Plaintiff, in the form of gratuity and to act directly for the Drivers' benefit.

93.     At all times, Uber withheld and continues to withhold gratuities given by customers to Uber drivers and/or gratuities that are incorporated into the set fare. Uber has also failed to reimburse Plaintiff for their employment related expenses.

94.     Uber's conduct damaged Plaintiff and other drivers.

## COUNT IV
## UNJUST ENRICHMENT

95.     Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

96.     Defendants unlawfully retained gratuities promised to Plaintiff and other drivers and failed to reimburse expenses.

97.     Defendants obtained these benefits from drivers by making material misrepresentations and taking advantage of them.

98.     As a result, Defendants has been unjustly enriched through their retention of a portion of the gratuities owed to the drivers.

99.     Plaintiff and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities.

22

## COUNT V
## <u>CONVERSION</u>

100.    Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

101.    Plaintiff and other Drivers have a superior right to possession of gratuities.

102.    Uber interfered with Plaintiff's right to their personal property by refusing to relinquish the property to them.  Instead, Uber retained the property for its own benefit without Plaintiff's permission.

103.    The converted property was personal.   For examples, the gratuities were specifically earmarked for the Drivers.

104.    Uber's conduct damaged Plaintiff's and he is entitled to restitution for their full share of proceeds, as well as treble damages.

## COUNT VI
## <u>FRAUD AND/OR INTENTIONAL OR NEGLIGENT MISREPRESENTATION</u>

105.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

106.    Uber represented to Plaintiff and other Drivers that he would receive gratuities, surge fares, and cancellation fees.  Uber did not pay these monies as promised.

107.    These misrepresentations were material because he affected Plaintiff and other Drivers' decisions to continue driving for Uber.

108.    Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiff and other Drivers based on its past practices of not doing so.

23

109. Plaintiff and other Drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was his employer and the party responsible for overseeing the payment of these monies.

110. Uber's conduct damaged Plaintiff and other Drivers.

## COUNT VII
## PROMISSORY ESTOPPEL

111. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

112. Uber promised to make certain payments, such as hourly wages, cancellation fees, and other payments, and to remit all gratuities to Plaintiff and other drivers. Instead, Uber kept this money for itself.

113. Based on its past practices of not paying tips to drivers, Uber knew at the time it made the promise that it was a lie.

114. Plaintiff and other drivers relied to their detriment on Uber's promise in continuing to drive for Uber and not seeking additional tips from passengers.

115. Plaintiff's and other Drivers' reliance was foreseeable because Uber—the entity that actually determines and pays drivers' compensation—made the false promise.

116. Uber's conduct damaged Plaintiff and other drivers.

117. Injustice can be avoided only by enforcing Uber's promise to remit all gratuities to Plaintiff and other drivers.

## COUNT VIII
## VIOLATION OF INTERNAL REVENUE CODE
### Rule 23 Class Only

118. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

24

119.     By failing to properly classify Plaintiff and all other Uber Drivers as employees, rather than independent contractors, and account for and pay proper FICA taxes on Plaintiff's behalf as required by the IRS during the course of his employment, Defendants willfully filed fraudulent information returns with the IRS, in violation of 26 U.S.C. § 7434.

120.     Under the Internal Revenue Code, 26 U.S.C. § 7434(a), "[if] any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return."

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, requests relief against Defendants as follows:

     a.     An award of damages, including compensatory, punitive, and treble damages, in an amount to be determined at trial;

     b.     Notice to the Class of this action;

     c.     An injunction against Defendants prohibiting Defendants from continued unlawful practices, policies and patterns set forth herein;

     d.     Liquidated damages, pursuant to FLSA;

     e.     Reasonable attorneys' fees and costs of this action;

     f.     Pre-judgment and post-judgment interest as provided by law;

     g.     Declaratory relief that Plaintiff and members of the class are employees under the relevant law;

     h.     An order directing Defendants to return to Plaintiff any gratuities and any other funds wrongfully kept by Defendants; and

     i.     Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demand a trial by jury on all claims so triable.

Dated: June 23, 2016

                              Respectfully submitted,

                              NEAL & HARWELL, PLC


                               s/ *Philip N. Elbert*
                              Philip N. Elbert, Bar No. 009430
                              Charles F. Barrett**, Bar No. 20627
                              Jeffrey A. Zager, Bar No. 032451
                              One Nashville Place, Suite 2000
                              150 Fourth Avenue North
                              Nashville, Tennessee 37219
                              (615) 244-1713 – Phone
                              (615) 726-0573 – Facsimile
                              pelbert@nealharwell.com
                              cbarrett@nealharwell.com
                              jzager@nealharwell.com

                              Paul B. Maslo**
                              Hunter J. Shkolnik**
                              NAPOLI SHKOLNIK PLLC
                              360 Lexington Ave., 11th Floor
                              New York, NY  10017
                              (212) 397-1000 – Phone
                              pmaslo@napolilaw.com
                              hunter@napolilaw.com

                              Brittany Weiner**
                              IMBESI LAW P.C.
                              450 Seventh Avenue, Suite 1408
                              New York, New York 10123
                              (212) 736-0007 – Phone
                              brittany@lawicm.com

                              *Attorneys for Plaintiff and the Class*


   ** Pending *pro hac vice* admission

26